Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
lauranielson@ericnielson.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| MARK A., *on his own behalf and on behalf of A.A., a minor*,<br><br>Plaintiffs,<br><br>vs.<br><br>ADOBE SYSTEMS INCORPORATED, AETNA LIFE INSURANCE COMPANY, and ADOBE SYSTEMS INCORPORATION GROUP WELFARE PLAN,<br><br>Defendants. | **COMPLAINT**<br><br>Case No.: 1:21-cv-00099-CMR<br><br>Judge Cecilia M. Romero |

**COME NOW** Mark A., on his own behalf and on behalf of A.A., a minor, collectively, individually, and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Mark A. ("Mark") is a natural person residing in San Jose, California. He is covered by a self-funded plan, Adobe Systems Incorporation Group Welfare Plan, ("the Plan"), provided through Mark's employer, Adobe, who is also the Plan Administrator.

1

2. Plaintiff A.A. ("A.A") is a resident of San Jose, California. As a beneficiary of his father's health insurance plan, he received treatment at View Point Center ("View Point"), a licensed residential treatment facility in Syracuse, Utah April 10, 2018, through June 13, 2018.

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the treatment in question was rendered in the State of Utah and the appeals were written by a company located in Salt Lake City, Utah.

5. Plaintiffs seek payment of A.A.'s denied claims from April 24, 2018, through June 13, 2018, pursuant to 29 U.S.C. §1132(a)(1)(B).

6. Plaintiffs seek injunctive relief pursuant to 29 U.S.C. §1132(a)(3) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

7. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

8. A.A. was born three weeks early and was delivered by C-section.

9. From around six weeks to 18 months old, A.A. developed a large, benign growth called a hemangioma on the left side of his face, which grew to the size of a grapefruit and largely affected his progress with balance and motor skills.

10. At age one, A.A. underwent a nine-hour surgery to have the hemangioma removed. During the procedure, the surgeon severed the facial nerve on the left side of his face which caused permanent damage resulting in the inability to fully smile.

11. In November of 2006, A.A. endured another nine-hour surgery to reconstruct his damaged facial nerve, which was done by grafting a harvested nerve from his ankle and bridging it between his right facial nerve, under his nose and then reconnecting it to the left side. Though, A.A. recovered about 80 percent of his facial tone and muscle use, he cannot fully smile or laugh without showing some asymmetry and trains two large scars behind each ear. A.A. suffers from very poor body image and lower self-esteem as a result of other children point out his imperfections.

12. In early 2016, A.A. had a particularly traumatic experience while attending a three-night sleepaway camp with his 5th grade class. We was treated poorly from staff who made little effort to accommodate his particular needs. For example, A.A. had been seeing a podiatrist and wearing orthotics since he was in 3rd grade due to a shortened Achilles tendon and flat feet, which makes walking long distances difficult. A.A. alerted staff to discomfort in his foot during a hike while at camp and was forced to walk back to camp. A.A. has a sensitivity to textures, strong flavors and smells and the staff only offered him cereal as an alternative which he ended up eating for every meal the entire stay at camp.

13. Upon returning home, A.A. reported severe abdominal pain so his mother took him to the ER. The pain was later determined to be psychological due to his traumatic week at camp. It was at this point that A.A. began having suicidal ideations, refusing to leave his mother or attend school and would often complain of stomach pain when he had to go to class.

14. In February of 2016, A.A. began seeing a child psychiatrist and was diagnosed with Generalized Anxiety Disorder and Major Depression and prescribed him Prozac, which resulted in minimal success.

15. In Spring of 2016, A.A.'s parents requested assessment and special education support from the school district. The district refused because of his previous strong academic performance. A.A. was offered and placed on a 504 plan for the Spring of 5th grade but continued to refuse school and suffer from severe anxiety when he could make it to class.

16. In Fall of 2016, A.A. started middle school. Immediately, he began refusing to attend school and developed increased suicidal ideation. According to the daily school logs A.A. only attended 32.83 percent of all instructional minutes in 6th grade and refused school for most of the fall and the times he did attend were spent mostly in the office. On top of this, A.A. developed urges to self-harm, severe anxiety and depression. His doctor added Klonopin to his medications with little success. Due to an increase in his A.A.'s psychiatric symptoms, his parents made the decision to change treatment teams to a new therapist who changed his medications to Ativan, Zoloft and Risperidone.

17. A.A.'s parents had him assessed at Children's Health Council (CHC). CHC diagnosed A.A. with several severe conditions, including: Autism Spectrum Disorder I with specific deficits in social communication and restricted, repetitive behaviors, Development Coordination Disorder, Generalized Anxiety Disorder, Unspecified Depressive Disorder, Separation Anxiety Disorder, and Sensory Processing Disorder. On multiple occasions, A.A.'s suicidal ideation reached the point where his parents had a Crisis Intervention Team come to their home.

18. On February 13, 2017, A.A. was finally found eligible for IEP support under OHI for severe anxiety.

19. Throughout the Winter and Spring of 2017, A.A. attended the Aspire program, an Intensive Outpatient Program at El Camino Hospital. The program focuses on DBT skills training for middle school age children.

20. Following completion of the Aspire, A.A. returned to psychiatric care. In addition, he began seeing the Program Director at Aspire, on an individual out-patient basis. A.A. performed adequately during the program but continued to experience episodes of anxiety and depression for the remainder of his 6th grade school year. Both A.A's psychiatrist and the Program Director advised his parents to admit him to a residential treatment program.

21. During the Summer between 6th and 7th grade, A.A. attended a variety of tutoring classes in order to catch up to grade level. He began to isolate himself more, retreating from friends. A.A. took up video games as a coping mechanism for his autism. Often, video games were the only activity that helped him re-regulate after an anxious episode or meltdown.

22. As 7th grade began, A.A.'s anxiety, depression, suicidal thoughts and self-harming behavior increased. This behavior included scratching his arm and biting the inner part of his cheek until it bled. Though, A.A. was able to attend some classes, he often retreated to the school's office. Unfortunately, the school was not able to provide adequate supervision or special needs services. As a result, A.A. would often become non-verbal or engage in self-harm. During one particularly violent episode, A.A. was found under the principal's desk, banging his head on the floor. During another episode, A.A. even tried to choke himself with a belt.

23. During the Fall and Winter of 7th grade, A.A. reported depression and anxiety most days and relied on his mom or school staff to help him regulate. When coached to use his DBT skills, he refused or said they didn't work and would beg to be picked up from school. It was discovered that A.A.'s triggers include noise, crowds, social situations, unexpected changes in

schedule or environment, quizzes and tests. He would frequently have thoughts of self-harm or suicide, included a plan to carry these out, both at school and home.

24. In 2018, A.A. continued to isolate himself, refusing to leave his room on weekends, abandoning household chores, and becoming increasingly depressed and suicidal. Sunday nights before school were particularly challenging. A.A. often had significant depressive episodes while preparing for school the next day, which would result in crying and having panic attacks. These panic attacks became increasingly intense and included seizure-like behavior, screaming, and uncontrollable crying which would result in the Crisis Team coming.

25. A.A. began consistently to refuse any kind of therapeutic service or intervention. This included refusing school-based therapies, private occupational therapies, and counseling sessions. At this point, AA.'s psychiatrist switched him from Risperidone to Abilify in addition to Zoloft in attempts to manage his increasingly unbalanced mood.

26. On April 10, 2018, given A.A.'s deteriorating condition, his clinical team recommended that he be placed in a residential treatment program where we could have access to 24/7 care to stabilize his behavior. After their recommendation, A.A. was transported to View Point.

### Pre-Litigation Appeal of the Plan's Denial of Coverage for A.A's Care

27. On April 25, 2018, Mark received a denial letter from the Plan. In this letter the Plan stated based on LOCAT ("Level of Care Assessment Tool") criteria, the information received does not show that A.A. "had poor judgement or thinking and that he may have hurt himself or put his life at risk", and his treatment was not medically necessary.

28. On October 11, 2018, Mark submitted a Level One Member Appeal. In this letter Mark states, "Aetna approved A.A.'s treatment from his date of admittance on April 10, 2018,

through April 23, 2018." He went on to argue that if it was medically necessary for two weeks, it wouldn't have been any less medically necessary after April 23rd. H concluded that the Plan's LOCAT criteria appears to not be up to date with the generally accepted standards for residential treatment.

29. On November 2, 2018, The Plan responded to Level One Member Appeal upholding the denial. The Plan mentioned the A.A. attended a Therapeutic Boarding School, View Point is a licensed residential treatment center, not a Therapeutic Boarding School.

30. On December 12, 2018, Mark submitted a Level Two Member Appeal. In this letter Mark states the Plan did not provide him with the information of the reviewer of the Level One Member Appeal nor did they provide him with the Plan's skilled nursing facility level of care criteria that he requested.

31. On January 7, 2019, the Plan responded to the Level Two Member Appeal upholding the denial.

32. On April 3, 2019, Mark submitted an Independent Review Organization Request.

33. Mark asked in his IRO request that the assigned IRO reviewer have expertise treating patients with A.A.'s specific diagnosis and to utilize a different criteria that does not include LOCAT.

34. On May 14, 2019, MCMC Federal ERO Review Team upheld the Plan's denial, stating that treatment from April 24, 2019, through June 13, 2018, was not medically necessary.

## FIRST CAUSES OF ACTION

**(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B)) and Claim for Equitable Relief Pursuant to 29 U.S.C. §1132(a))**

2. ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits. 29 U.S.C. §1104(a)(1).

3. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1104(a)(1)(D) and §1133(2).

35. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the A. Family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for A.A's claim denial, written in a manner calculated to be understood by the A. Family; 2) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the A.A.'s claim; 3) by developing and relying upon internal practices and policies that improperly restricted coverage in contravention of Plaintiffs' health insurance plans, ERISA, and the Parity Act; and 4) by failing to discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.

## SECOND CAUSE OF ACTION

**(Claim for Violation of the Parity Act)**

33. The Parity Act is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and the Parity Act.

34. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification

that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

35. The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

36. Impermissible nonquantitative treatment limitations under the Parity Act include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

37. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for A.A.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does the Plan exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner the Plan excluded coverage of treatment for A.A. at View Point.

38. Specifically, the Plan's reviewers utilized acute criteria such as "does not show that you have poor judgment or thinking and that you may or have hurt yourself or put your life at risk" to evaluate the non-acute treatment that A.A. received. In addition, the Defendants relied on such assertions such as "family was involved in treatment" as a justification to deny treatment.

9

Family involvement serves as an indicator rather than a contra-indicator of the medical necessity of treatment in a non-acute residential setting.

39. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a nonacute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

33. When the Plan receives claims for intermediate-level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. The Plan evaluated A.A.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

34. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

35. The violations of the Parity Act by the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

36. A declaration that the actions of the Defendants violate the Parity Act;

37. An injunction ordering the Defendants to cease violating the Parity Act and requiring compliance with the statute;

38. An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with the Parity Act;

39. An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of the Parity Act;

40. An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of the Parity Act;

41. An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

42. An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of the Parity Act; and

43. An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of the Parity Act.

44. 45. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A.

45. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

## **RELIEF**

46. WHEREFORE, the Plaintiffs seek relief as follows:

47. Judgment in the total amount that is owed for A.A.'s medically necessary treatment at View Point under the terms of the Plan, plus pre- and post-judgment interest to the date of payment;

48. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

49. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

50. For such further relief as the Court deems just and proper.

51.

RESPECTFULLY SUBMITTED this 9th day of July 2021.

G. ERIC NIELSON & ASSOCIATES
 */s/ Laura Nielson*
Laura Nielson

*Attorney for Plaintiff*